UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LAVELL  PATTERSON,                            )
                                              )
                        Plaintiff,            )
                                              )
              vs.                             )          No. 1:14-cv-00468-SEB-MJD
                                              )
CAROLYN W. COLVIN Commissioner of the         )
Social Security Administration,               )
                                              )
                        Defendant.            )

**REPORT AND RECOMMENDATION**

Lavell Patterson ("Plaintiff") requests judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his application

for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth below, the Magistrate

Judge recommends that the decision of the Commissioner be **AFFIRMED.**

**<u>Procedural History and Background</u>**

Plaintiff filed an application for DIB on June 17, 2011, alleging an onset of disability on

May 15, 2011. [R. at 11.] He was 39 years old at the time of the alleged onset and was working

part-time as a support advocate or home attendant[1] at the time of his application. [R. at 36.]  He

alleged disability due to anxiety disorder and bipolar disorder. [*Id.*][2]

---

[1] This work involved helping others cook, clean, and otherwise "keep care of themselves." [R. at 45.]
[2] Plaintiff recited the relevant factual and medical background in more detail in his opening brief. [*See* Dkt. 17.] The
Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 18.] Because these facts
involve Plaintiff's confidential and otherwise sensitive medical information, the Court will incorporate by reference
the factual background in the parties' briefs and will articulate only specific facts as needed herein.

The Social Security Administration ("SSA") denied Plaintiff's claim initially on August 8, 2011 and upon reconsideration on December 20, 2011. [R. at 11.] Plaintiff requested a hearing, and on November 9, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Marc C. Ziercher. [*Id.*] Also present were Plaintiff's attorney, Patrick Mulvany, and vocational expert Jay Franklin. [R. at 30.] The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date through the date of his January 24, 2013 decision. [R. at 24.] The Appeals Council denied Plaintiff's request for review on February 7, 2014, thereby rendering the ALJ's decision final. [R. at 1-3.] Plaintiff filed his complaint with this Court on March 25, 2014. [Dkt. 1.]

## **Applicable Standard**

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.[3] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is

---

[3] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or Supplemental Security Income. However, separate, parallel statutes and regulations exist for Disability Insurance Benefits and Supplemental Security Income claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step

two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his

ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step

three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of

Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-

month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step

four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. §

404.1520(f). At step five, if the claimant can perform any other work in the national economy, he

is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be

upheld by this Court "so long as substantial evidence supports them and no error of law

occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of

the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in

writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181

(7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the

relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ

must articulate her analysis of the evidence in her decision; while she "is not required to address

every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . .

[and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d

at 1176. The Court, that is, "must be able to trace the ALJ's path of reasoning" from the evidence

to her conclusion. *Clifford v. Apfel*, 227 F.3d 863, 874 (7th Cir. 2000), *as amended* (Dec. 13, 2000).

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the act through December 31, 2015. [R. at 13.] At step one of the sequential evaluation process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 15, 2011. [*Id.*]

At step two, the ALJ determined that Plaintiff had the following "severe" impairments: "bipolar disorder" and "an anxiety disorder, not otherwise specified." [R. at 14.] At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listed impairment. [*Id.*] The ALJ considered and rejected Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorder). [R. at 14-15.] In doing so, he applied the SSA's special technique for evaluating mental disorders. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. He thus considered the "paragraph B" criteria and determined that Plaintiff had mild restrictions in activities of daily living; moderate restrictions in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. [R. at 14-15.] He then determined that the evidence did not establish the presence of the "paragraph C" criteria. [R. at 15.]

The ALJ next analyzed Plaintiff's residual functional capacity ("RFC"). He concluded that Plaintiff:

> has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform goal-oriented rather than production-oriented work. He can understand, remember, and perform simple work tasks at GED Reasoning Level 02 (as defined in the Selected Characteristics of Occupations). He can have inconsequential or superficial interaction with the general public (i.e., no

sustained conversations, e.g., ticket taker). He can have inconsequential or superficial interaction with coworkers (i.e., no sustained conversations, e.g., mail clerk). He can perform work that involves routine and repetitive tasks (i.e., no more than frequent changes in core work duties on a weekly basis). He can perform productive work tasks for up to an average of 96 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks.

[R. at 16] The ALJ concluded at step four that this RFC did not allow Plaintiff to perform his past relevant work as a home attendant. [R. at 21.] At step five, the ALJ determined that a person with Plaintiff's age, education, work experience, and RFC could perform jobs such as church janitor and night office cleaner. [R. at 22.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled. [R. at 22-23.]

## Discussion

Plaintiff presents four arguments for remand. He first broadly contends that "[s]ubstantial evidence fails to support the ALJ's erroneous determination that Lavell Patterson was not disabled[.]" [Dkt. 17 at 10.] He then argues that the ALJ erred by not summoning a medical advisor to testify on whether Plaintiff's combined mental impairments met or medically equaled a Listing, such as Listing 12.03. [*Id.* at 16.] Next, he contends that the ALJ's credibility determination was patently erroneous because it was contrary to Social Security Ruling 96-7p. [*Id.* at 19.] Finally, he argues that the ALJ's RFC analysis and hypothetical questions did not properly account for his functional limitations, such that the ALJ's step five conclusion was erroneous. [*Id.* at 21.]

### A. Substantial Evidence and Disability Determination

Plaintiff's broad first argument contains three narrower claims. He argues that the ALJ erred by rejecting a treating physician's opinion on Plaintiff's functional capacity [*id.* at 12-13]; that the ALJ improperly refused to consider Plaintiff's low GAF scores; [*id.* 10-12]; and that the

ALJ erred by not specifically discussing Listing 12.03 during step three of the sequential evaluation. [*Id.* at 12-13.]

### 1. Treating Physician's Opinion

In October 2012, treating[4] physician Dr. Dennis Anderson completed a Mental Residual Functional Capacity form on which he indicated that Plaintiff was "markedly limited" in twenty different functional areas. [R. at 957-58.] These areas included the ability to understand and remember tasks; sustain concentration and pace; interact appropriately with the general public; and respond appropriately to changes in work settings. [*Id.*] The ALJ gave this opinion "little weight," [R. at 20], and Plaintiff contends that the ALJ erred in doing so. [Dkt. 17 at 12-13.]

Generally, a "treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). To receive such weight, however, the opinion must be "supported by the medical findings and consistent with substantial evidence in the record." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). Thus, an "ALJ may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician, or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability." *Id.* (citations and quotations omitted).

The ALJ in this case explained in detail why he gave Dr. Anderson's opinion little weight. First, he noted that the form at issue offered an opinion on Plaintiff's "residual functional capacity," rather than offering a medical opinion or a medical source statement on the impact of Plaintiff's impairments. [R. at 20.] Although an RFC analysis and a medical source statement are necessarily related, "they are not the same thing: A medical source statement is evidence that is

---

[4] The ALJ referred to Dr. Anderson as Plaintiff's "treating source," [R. at 19], and the Commissioner does not dispute that the doctor had a treating relationship. [*See* Dkt. 18 at 9-10.]

submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge." SSR 96-5p. In contrast, "an RFC assessment is the [ALJ's] ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." *Id.* Thus, although a medical source statement from a treating physician is typically entitled to controlling weight on medical issues, *see id.*, the ALJ in this case had no obligation to give Dr. Anderson's *RFC analysis* such weight. *See id.* ("[T]he overall RFC assessment is an administrative finding on an issue reserved to the Commissioner[.]").

Next, the ALJ noted that "marked" is a term of art within Social Security disability law,[5] and that nothing on Dr. Anderson's form indicated that he understood what the term meant in assessing Plaintiff's residual functional capacity. [R. at 20.] The ALJ was thus correct to accord less weight to Dr. Anderson's opinion. *See* SSR 96-5p ("Medical sources often offer opinions about . . . work-related terms; . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded. However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.").

Finally, the ALJ noted that Dr. Anderson's form was inconsistent with his other opinions about Plaintiff's impairments. [R. at 20.] In the same report that contained the Mental RFC form, Dr. Anderson stated that Plaintiff was "able to work two days a week." [R. at 956.] Dr. Anderson also opined that "Lavell can work another day up to three days per week." [R. at 988.] Neither of those opinions explained how Plaintiff was able to work multiple days each week despite

---

[5] The term "marked" means "more than moderate but less than extreme." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. At the hearing, Plaintiff's attorney stated that having "marked limitations" in a given functional area means that a claimant is "essentially non-functional" in that area. [R. at 57.]

purportedly "marked" limitations in basic areas such as the "ability to understand and remember very short and simple instructions" and the "ability to make simple work-related decisions." [*See* R. at 956-59, 988.] Additionally, one of Dr. Anderson's opinions specifically noted that Plaintiff was studying at a local Mosque and felt that he could "concentrate and understand the lessons better." [R. at 985.] Again, such observations are inconsistent with allegedly "marked" limitations in areas such as "the ability to maintain attention and concentration for extended periods." [R. at 957.] In light of these inconsistencies, the ALJ did not err in according Dr. Anderson's opinion little weight. *See Skarbek*, 390 F.3d at 503 (7th Cir. 2004). ("An ALJ may discount a treating physician's medical opinion . . . when the treating physician's opinion is internally inconsistent[.]").

Plaintiff's argument is therefore unavailing: To the extent Dr. Anderson's form was an evaluation of Plaintiff's "marked" limitations and his RFC, it was an opinion on an issue reserved to the Commissioner, and was thus entitled to no special weight. *See* SSR 96-5p. And to the extent the form was a medical opinion on the impact of Plaintiff's impairments, it was inconsistent with Dr. Anderson's other opinions, and again, was thus entitled to no special weight. *See Skarbek*, 390 F.3d at 503. The ALJ's evaluation of this evidence thus does not require remand.

### 2. Consideration of GAF Scores

During the course of his treatment, several medical providers assigned Plaintiff a Global Assessment of Functioning ("GAF") score. These scores reflect a clinician's assessment of an adult's ability to function in psychological, social, and occupational settings. [R. at 18 n.2.] The scores range from 0 to 100, with a lower score indicating more severe impairment in functional areas. *Id.*

In 2008, Plaintiff was hospitalized with signs of "paranoia, grandiosity and delusions." [R. at 880.] The hospital staff assigned a GAF of 10, indicating severe impairments and possible danger of harm to others. [R. at 881; *see also* Dkt. 17 at 4 n.3.] Plaintiff "improved rapidly" with medication, and he was discharged for outpatient treatment with Dr. Anderson. [R. at 881.] On May 15, 2011, Plaintiff was again hospitalized, this time with signs of "disorganized behaviors, grandiosity, and agitation." [R. at 883.] The hospital assigned a GAF "equal to 10 to 20," indicating severe impairments. [*Id.*] Again, however, medication improved Plaintiff's disposition, [R. at 885-86], and he was discharged with a GAF score "equal to 50 to 55." [R. at 883.]  Finally, Dr. Paul Deardorff performed a mental consultative examination on August 3, 2011. [R. at 744.] He assigned a GAF score of 49, [R. at 748], which, as the ALJ noted, indicates "[s]erious symptoms" or a "serious impairment in social, occupational, or school functioning." [R. at 18 n.2]

Plaintiff contends that these low GAF scores "indicat[e] total disability," [Dkt. 17 at 10], and that the ALJ's decision not to accept them as such was "arbitrary and erroneous." [*Id.* at 11.] This argument, however, suffers from multiple flaws.

First, the lowest GAF score was assigned in 2008, well before the May 15, 2011 alleged date of onset. [*See* R. at 11, 881.] In the intervening years, Plaintiff worked at a level that qualified as substantial gainful activity. [*See* R. at 125.] The 2008 GAF score thus has little bearing on whether Plaintiff is unable to engage in substantial gainful activity at this time. If anything, the 2008 score and Plaintiff's subsequent employment constitute evidence that— despite Plaintiff's long-standing mental impairments—he is nonetheless able to work.

Second, and more fundamentally, GAF scores are not as probative of disability as Plaintiff asserts. A GAF score is "useful for planning treatment," but it "does not reflect the

clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quotation omitted). Thus, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Id.* (quotation omitted). Plaintiff may therefore argue that his GAF scores "prov[e] total disability," [Dkt. 17 at 11-12], but this assertion is not consistent with the law as articulated in *Denton*.

Finally, Plaintiff notes that, even if GAF scores are not determinative of disability, they may still be credible evidence that an ALJ must consider. [*Id.* at 12 (citing *Campbell v. Astrue*, 627 F.3d 299 (7th Cir. 2010)).] This assertion is correct insofar as the "ALJ's decision must be based upon consideration of all the relevant evidence," *Herron*, 19 F.3d at 333, including GAF scores that may be probative of impairment in functioning. *See, e.g.*, *Campbell*, 627 F.3d at 306-07 (faulting ALJ for ignoring the portion of a mental health exam that contained GAF scores).

In this case, however, the ALJ fulfilled the requirement that he consider all relevant evidence. During his RFC assessment, the ALJ specifically discussed the 2011 hospitalization at which Plaintiff was assigned a GAF score between ten and twenty. [R. at 17.] Although he did not explicitly cite the score, he acknowledged that Plaintiff showed symptoms such as confusion, auditory hallucinations, and agitation. [*Id.*] The ALJ then noted that Plaintiff's symptoms resulted from his non-compliance with his medication regimen, and that, after receiving medication, Plaintiff's symptoms subsided. [*Id.*] The hospital then discharged Plaintiff with his mental disorders "in full remission." [*Id.*] The ALJ was therefore justified in determining that, despite the initially low GAF score, Plaintiff's 2011 hospitalization did not support his entitlement to disability benefits. *See, e.g.*, 20 C.F.R. § 404.1530(b) (forbidding finding of disability for claimant who does not follow prescribed treatment); *see also Wilder v. Chater*, 64 F.3d 335, 336 (7th Cir. 1995) ("[A] disabled person cannot obtain social security disability

benefits if he or she refuses to follow a prescribed course of treatment that would eliminate the disability.").

The ALJ also specifically considered Dr. Paul Deardorff's assignment of a GAF score of 49. [R. at 17-18.] He noted that such a score implies "serious" symptoms or impairments in areas such as social or occupation functioning, [R. at 18 n.2], but the ALJ then noted that other treatment records showed that Plaintiff "was consistently doing well." [R. at 18.] Plaintiff, for instance, usually had a "calm mood," "logical thinking," and "good concentration, judgment, and insight." [*Id.* (citing R. at 970, 989, 1074, 1090, 1115, 1122, 1128, 1131, 1136, 1150, 1159, 1161, 1172).] Moreover, the records the ALJ cited specifically indicated that Plaintiff was "exhibiting more confidence in interacting" with others in a public setting [R. at 989]; was capable of following instructions and performing job-related tasks [R. at 1172]; was "friendly and responsive to social cues," [*id.*]; and "appeared friendly and talkative with others." [R. at 1074.] These sorts of observations are hardly consistent with GAF scores implying "serious" impairments in occupational or social functioning. Thus, rather than making an "arbitrary and erroneous" decision to discount Plaintiff's GAF scores, [Dkt. 17 at 11], the ALJ simply decided to credit the extensive treatment records that indicated Plaintiff's impairments were not as severe as the GAF scores implied. The ALJ therefore complied with his duty to evaluate all relevant evidence, and his consideration of the GAF scores does not require remand.

### 3. Step Three Analysis and Listing 12.03

At step three, the ALJ must determine whether the claimant's impairments meet or medically equal any impairment that appears in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(d). The ALJ "should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand." *Ribaudo v. Barnhart*,

458 F.3d 580, 583 (7th Cir. 2006) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir.2004)). The claimant, however, "has the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Id.*

In this case, the ALJ specifically considered whether Plaintiff's impairments met the requirements for Listing 12.04 (affective disorders) and Listing 12.06 (anxiety-related disorders). [R. at 14.] He did not specifically mention Listing 12.03, [*see* R. at 14-15], which covers "schizophrenic, paranoid and other psychotic disorders." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff contends this omission was erroneous because he was diagnosed in 2011 with "Schizoaffective affective disorder," [R. at 883], such that consideration of Listing 12.03 was required.

Listings 12.03, 12.04, and 12.06 are part of the CFR's broader Listing for mental disorders. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Each of these Listings consists of "paragraph A criteria (a set of medical findings)," "paragraph B criteria (a set of impairment-related functional limitations)," and "additional functional criteria (paragraph C criteria)." *Id.* To satisfy any of these three Listings, a claimant must show that his impairment satisfies "the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment." *Id.*

The paragraph B criteria consist of four functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."[6] *Id.* To

---

[6] "[E]pisodes of decompensation" are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpart P., App. 1, § 12.00. "An incident—such as hospitalization or placement in a halfway house—that signals the need for a more structured psychological support system would qualify as an episode of decompensation, but so would many other scenarios." *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (citation omitted).

satisfy the paragraph B criteria of Listing 12.03, 12.04, or 12.06, the claimant must establish "marked" limitations in two of the first three areas, or "marked" limitations in one of these areas in addition to "repeated" episodes of decompensation of "extended duration." *Id.*

In this case, the ALJ did not specifically mention Listing 12.03, but he extensively analyzed the paragraph B criteria during his analysis of Listing 12.04 and 12.06. He found Plaintiff had only "mild" restrictions in activities of daily living, and as support, he cited numerous functional reports indicating that Plaintiff could perform tasks such as shopping, doing laundry, caring for himself, and doing chores. [R. at 14 (citing R. at 176, 188, 198).] He also noted that Plaintiff continued to work part-time as a support advocate or home attendant, which required "showing others how to cook meals and do household chores." [*Id.* (citing R. at 45).] This confirmed that there was "little indication" that Plaintiff's mental impairments affected "his ability to perform activities appropriate to his circumstances[.]" [*Id.*]

Next, the ALJ determined that Plaintiff had only "moderate" limitations in social functioning. [R. at 15.] The ALJ acknowledged that Plaintiff reported hearing voices, [*see, e.g.*, R. at 744], had feelings of isolation, [*see, e.g.*, R. at 746-47], and avoided crowds. [*See, e.g.*, R. at 744.] However, the ALJ also cited treatment records indicating that Plaintiff could appropriately interact with people in public settings, such as shopping malls, [R. at 15 (citing R. at 961)], and noted that Plaintiff's own functional reports "indicated no problems getting along with family, friends, or neighbors." [*Id.* (citing R. at 179).] Third-party opinions confirmed these reports, [*see, e.g.*, R. at 188, 192, 200], and the ALJ thus concluded that Plaintiff's limitations were merely "moderate," rather than "marked." [R. at 15.]

The ALJ then turned to "concentration, persistence or pace." He acknowledged that Plaintiff reported problems that "interfere[d] with his ability to sustain focused attention and

concentration." [*Id.*] Nonetheless, the ALJ noted that a mental status exam showed that he was "able to understand, remember, and carry out tasks such as random digits forward and backward and serial sevens." [*Id.* (citing R. at 745-46).] He thus concluded that Plaintiff had "moderate" but not "marked" difficulties in this area. [*Id.*]

Finally, the ALJ considered episodes of decompensation and noted that the record showed no such episodes of extended duration. [*Id.*] He acknowledged that Plaintiff had a "manic episode in May 2012" that resulted in an inpatient stay, but characterized this stay as "brief," rather than "extended." [R. at 18.] The ALJ thus concluded that Plaintiff's impairments satisfied none of the paragraph B criteria, such that his mental disorders did not meet or equal a Listing. [R. at 15.]

In challenging this aspect of the ALJ's decision, Plaintiff has not satisfied his burden, *see Ribaudo*, 458 F.3d at 583, to show that his condition actually satisfied any of the paragraph B criteria outlined above. Plaintiff argues that the "diagnosed GAFs of 10, 20, 40 and 50" and his treating doctor's "functional findings that the claimant had Marked limitation" should have been sufficient to "prove[] the claimant's disability under the 'B' criteria." [Dkt. 19 at 4 (citation omitted).] As explained above, however, the ALJ properly discounted both the GAF scores and the treating physician's mental RFC analysis. This evidence therefore does not satisfy Plaintiff's burden to establish the B criteria.

Next, Plaintiff argues that his prior hospitalizations should have established at least the presence of repeated episodes of decompensation of extended duration. [*Id.*] He notes that he had "five inpatient psychiatric hospitalizations for his psychotic behaviors," and contends that the ALJ improperly ignored these events. [*Id.*]

This evidence, however, does not establish that Plaintiff suffered from repeated episodes of decompensation of extended duration. As used in the Listing of Impairments, the "term repeated episodes of decompensation, each of extended duration . . . means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. In this case, the hospitalizations to which Plaintiff refers occurred in 2006, [*see* R. at 880], May 2008, [R. at 877], July 2008, [R. at 880], May 2011, [R. at 883], and May 2012, [R. at 928.] In the time between the 2008 and 2011 hospitalizations, Plaintiff engaged in substantial gainful activity, [*see* R. at 125], and thus was not disabled by the earlier hospitalizations. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as inability to engage in substantial gainful activity); 20 C.F.R. § 404.1520 ("If you are working and the work you are doing is substantial gainful activity, we will find that you are not disabled regardless of your medical condition or your age, education, and work experience.").

The remaining hospitalizations—in May 2011 and May 2012—cannot establish repeated episodes of decompensation of an extended duration: the May 2012 examination was too short to qualify, [*see* R. at 928-29], and even if it had been longer, Plaintiff would still have suffered only two of the three episodes required to establish "repeated" episodes of decompensation. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff thus has not met his burden to show that he satisfied this portion of the paragraph B criteria.

After evaluating paragraph B, the ALJ turned to paragraph C. [R. at 15.] Establishing the presence of the C criteria requires showing 1) "[r]epeated episodes of decompensation, each of extended duration;" or 2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or 3 a "current history of 1 or more years'

inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. The ALJ found no evidence that Plaintiff satisfied any of these criteria. [R. at 15.] Plaintiff points to his hospitalizations as evidence of decompensation, [Dkt. 17 at 10], but, as described above, Plaintiff's hospitalizations do not satisfy this criterion. Plaintiff has not pointed to any other evidence suggesting he has satisfied one of the paragraph C criteria, [*see* Dkt. 17], and Plaintiff therefore has not carried his burden to show that this paragraph was satisfied.

This analysis indicates that remand is not required. By extensively discussing the paragraph B and C criteria, the ALJ provided more than a "perfunctory" analysis of Listing 12.03, such that his failure to mention the Listing by name was not fatal to his opinion. *See Ribaudo*, 458 F.3d at 583. Further, even if an error did occur, it was harmless: An error is harmless when the Court can say with "great confidence" that the result on remand would be the same. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Here, Listing 12.03 requires establishing the presence of either the paragraph B or paragraph C criteria. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. As explained above, Plaintiff failed to meet his burden to show that either of these paragraphs was satisfied. Thus, the Court could remand the case for a specific consideration of Listing 12.03, but the ALJ could simply repeat the paragraph B and paragraph C analysis he already completed and conclude that Plaintiff's impairments did not meet or medically equal Listing 12.03. The result on remand would thus be the same, and remand therefore is not required.

### B. Medical Advisor

At the hearing before the ALJ, Plaintiff's attorney requested that the ALJ "convene a supplemental hearing to take testimony from a medical advisor, psychologist regarding whether

his combined impairments are medically equivalent to any listed impairment." [R. at 59.] The ALJ ultimately declined to do so, and Plaintiff now argues that this constitutes reversible error. [Dkt. 17 at 16.] He specifically contends that the ALJ's step three determination was based on the ALJ's "layman's opinion," rather than on a medical expert's opinion, and that the ALJ "simply assumed" that Plaintiff's impairments did not meet a Listing. [*Id.* at 16-17.]

The SSA provides that the determination of equivalence is a "legal question" for which the ALJ—rather than a medical expert—is ultimately responsible. SSR 96-6p. Nonetheless, "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] must be received into the record as expert opinion evidence and given appropriate weight." *Id.*

The ALJ in this case satisfied this requirement. The record before the ALJ contained Disability Determination and Transmittal Forms indicating that state agency reviewing experts had assessed the issue of equivalence and had determined that Plaintiff's impairments did not meet or medically equal a listing. [*See* R. at 62-63.] "These forms conclusively establish that 'consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review,'" and the ALJ "may properly rely upon the opinion of these medical experts." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citations omitted). Contrary to Plaintiff's argument, then, the ALJ at step three did not rely on his "layman's opinion" [Dkt. 17 at 16]; instead, he properly relied on the medical equivalence determination of the state agency experts.

Plaintiff then argues that, even if the ALJ did consider the state agency opinions, these opinions "could not be reasonably relied on by the ALJ" because they pre-dated additional evidence in the record. [Dkt. 17 at 16; *see also* Dkt. 19 at 5.] Under SSR 96-6p, however, an ALJ

must obtain an updated medical opinion only when 1) "no additional medical evidence is received, but in the opinion of the [ALJ] the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable;" or when 2) "additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p.

Plaintiff in this case argues that the second situation applies, but the only "additional medical evidence" he cites is the October 2012 mental RFC form on which Plaintiff's physician indicated that Plaintiff had "marked" limitations in various functional areas. [Dkt. 17 at 16.] As explained above, the ALJ properly determined that this form was entitled to little weight, such that it likely would not have changed the opinions of the state agency medical experts. Further, SSR 96-6p specifically states that summoning a medical advisor for an updated opinion on the basis of additional evidence is necessary only if, "in the opinion of the administrative law judge," the evidence would change the state experts' opinions. SSR 96-6p. The SSA thus gives the ALJ considerable discretion in deciding when to summon a medical advisor for a new opinion on equivalence. *Accord Young v. Colvin*, No. 1:13-CV-02016-TWP-MJD, 2015 WL 331287, at *4 (S.D. Ind. Jan. 22, 2015) ("[T]he decision to seek an updated medical opinion lies squarely within the ALJ's discretion."). In light of this discretion, and in light of the limited probative value of the "additional evidence" at issue in this case, the Court cannot say that the ALJ erred in declining to summon a medical advisor for an updated opinion on equivalence. This argument therefore does not require remand of the ALJ's decision.

### C. Credibility Determination

The ALJ determined that the claimant was "partially credible" because the "symptoms and limitations described by the claimant" were not fully supported by the evidence in the record. [R. at 19.] Plaintiff contends this finding was erroneous for two reasons. First, he argues that the finding was incorrect because the evidence in the record actually *did* fully support Plaintiff's statements about his limitations. [Dkt. 17 at 19; Dkt. 19 at 7.] Second, he argues that even if the objective evidence did not support Plaintiff's statements, it was nonetheless erroneous for the ALJ to rely solely on this lack of objective evidence in making his credibility determination. [Dkt. 17 at 20.]

Plaintiff's first argument is unavailing. He contends that the ALJ's credibility determination ignored "the psychiatric and psychological evaluations cited above which proved the claimant's combined impairments met or equaled Listing 12.03 and thus fully corroborated the claimant's allegations of total disability." [Dkt. 17 at 19.] The "evaluations cited above" consist of Plaintiff's GAF scores, [*id.* at 10-12], and the treating physician's mental RFC form. [*Id.* at 12-13, 16.] As explained previously, these evaluations were entitled to little weight and hardly established Plaintiff's "total disability." Moreover, the ALJ cited numerous treatment records indicating that, despite Plaintiff's allegations of "total disability," his conditions caused little functional impairment. [*See, e.g.*, R. at 18 ("Treatment records dated from 2011 through 2012 show . . . that when the claimant was compliant with his medication, his mood was stable and 'normal'[.]"); *id.* ("[P]rogress notes show [claimant] participated in group sessions and skill and development training[.]"); *id.* ("Recent progress notes dated September 2012 show the claimant continues to functional well. . . . Moreover, he continues to work three days a week

part-time and reports things are going well.").] Thus, the ALJ's credibility finding was not contrary to the medical evidence in the record.

Plaintiff's second argument rests on SSR 96-7p, which provides that "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p. Instead, "the absence of objective medical evidence supporting an individual's statements . . . is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence." *Id.* Plaintiff contends the ALJ in this case failed to comply with this requirement because his negative credibility determination was based solely on the lack of objective medical evidence. [*See* Dkt. 17 at 20.]

The ALJ's opinion does not support this contention. The ALJ did note that "there is insufficient objective medical evidence" to support Plaintiff's statements, [R. at 19], but he also provided other reasons for discounting Plaintiff's credibility.[7] First, he noted inconsistencies within Plaintiff's own statements: Plaintiff, for instance, testified at the hearing that he could not work, [R. at 37], and that his medications caused side effects such as anxiety. [R. at 43.] As the ALJ noted, however, Plaintiff previously stated that his work as a support advocate was going well and that his medications caused no side effects. [R. at 18.] Such inconsistency in the claimant's own statements is a valid reason to discount a claimant's credibility. *See, e.g.*, *Adams v. Astrue*, 880 F. Supp. 2d 895, 909 (N.D. Ill. 2012) (approving negative credibility finding where, *inter alia*, ALJ "found claimed limitations inconsistent with . . . [claimant's] own prior

---

[7] The ALJ did not specifically cite these reasons in the same paragraph as his ultimate conclusion on Plaintiff's credibility, but they are still relevant to the credibility determination. *See, e.g.*, *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) (assessing credibility determination based on "the ALJ's opinion as a whole").

statements"). The ALJ in this case thus acted properly in discounting Plaintiff's credibility on this basis.

Next, the ALJ observed that Plaintiff did not consistently follow his medication regimen. During the May 2011 hospitalization, for instance, "it was determined that [Plaintiff] was non-compliant with his medications," [R. at 17; *see also* R. at 592-593], and later records indicated only intermittent compliance. [*See, e.g.*, R. at 18 (reporting stable mood "when the claimant was compliant with his medications"); R. at 1105 ("[Plaintiff] had stopped taking Latuda on his own").] Again, this is a valid reason to discount a claimant's credibility. *See* SSR 96-7p ("[T]he individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed[.]").[8] Thus, the ALJ again acted properly in finding that the record before him supported a negative credibility finding.

For these reasons, then, the ALJ did not base his credibility determination "solely" on the lack of "objective medical evidence." SSR 96-7p. Instead, he considered other aspects of the record and thus complied with the requirement that he evaluate Plaintiff's credibility on the basis of all the evidence before him. *See id.* As such, the ALJ's credibility determination does not require remand.

### D. Step Five Determination and RFC Analysis

At step five, the ALJ asked the vocational expert a series of hypothetical questions that incorporated the limitations from the ALJ's RFC analysis. [R. at 52-56.] The vocational expert testified that a person with such limitations could perform jobs such as church janitor and night

---

[8] The Social Security Ruling adds that before drawing a negative credibility inference on this basis, the ALJ must consider any explanations for non-compliance that the claimant might provide. *See* SSR 96-7p. The ALJ in this case complied with this requirement by asking about side effects or other reasons that Plaintiff might avoid taking his medication. [R. at 42, 44.] In response, Plaintiff did complain of side effects such as anxiety, [R. at 42], but in light of his earlier reports that he had *no* side effects, [*see* R. at 18], the Court is not inclined to find that the ALJ improperly considered this aspect of Plaintiff's non-compliance. *See Overman*, 546 F.3d at 462 (noting that reviewing court "may not reweigh the evidence or substitute its judgment for that of the ALJ").

office cleaner, both of which existed in significant numbers in the national economy. [*See* R. at 53.] The ALJ thus concluded that Plaintiff was not disabled. [R. at 22-23.]

Plaintiff contends that the step five determination was flawed because the ALJ's underlying RFC analysis was also flawed. He specifically argues that the RFC analysis "failed to account for the claimant's combined mental impairments" because the analysis 1) did not account for the "Marked Limitations" in Plaintiff's treating physician's Mental RFC report; and 2) did not account for "GAF assessments in the totally disabled range." [Dkt. 17 at 21.] As described above, however, the ALJ specifically discussed both the treating physician's report and the GAF scores, and he properly determined that neither of these pieces of evidence was entitled to significant weight. He therefore did not "fail[] to account" for the limitations described in these reports; rather, he simply determined that the alleged limitations went beyond those that Plaintiff actually suffered.

Additionally, even if the ALJ granted little weight to the mental RFC report and the GAF scores, he incorporated other limitations for Plaintiff's mental impairments in his RFC analysis. The ALJ, for instance, limited Plaintiff to "simple," "routine and repetitive" work tasks; to "inconsequential or superficial interaction with the general public; and to "inconsequential or superficial interaction with coworkers." [R. at 16.] The ALJ then included these limitations in his hypothetical questions to the vocational expert. [R. at 52-56.]

Plaintiff nonetheless contends that the limitation to simple, routine, and repetitive tasks did not properly account for Plaintiff's "moderate" difficulty with concentration, persistence, or pace. [Dkt. 17 at 22.] He notes that courts have previously found that merely limiting a claimant to such tasks does not necessarily orient a vocational expert to the full range of a claimant's limitations, such that hypothetical questions should incorporate more precise terminology. *See,*

*e.g.*, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("In most cases . . . , employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace.").

In this case, however, the ALJ did more than simply indicate that Plaintiff could perform simple, routine, and repetitive tasks. First, he stated that Plaintiff could "understand, remember, and perform simple work tasks at GED [Reasoning] Level 2, as that term is defined in [the] Selected Characteristics of Occupations." [R. at 53.] This Reasoning Level, in turn, "requires the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions' and to '[d]eal with problems involving a few concrete variables in or from standardized situations.'" *Mattison v. Astrue*, No. 09-C-60, 2009 WL 2591628, at *29 n.18 (E.D. Wis. Aug. 21, 2009) (quotation omitted). Second, the ALJ elaborated on his statement that Plaintiff could perform "routine and repetitive tasks," as he defined this phrase to mean that Plaintiff could not cope with more than frequent or minimal changes in his work duties on a weekly basis. [*See* R. at 16, 53.]

The ALJ's hypothetical in this case thus explained Plaintiff's limitations on concentration, persistence, or pace in a way that provided more detail than the hypothetical questions at issue in cases such as *O'Connor-Spinner*. Moreover, this Court has previously approved the use of hypotheticals that incorporate a plaintiff's limitations on concentration, persistence, or pace by reference to GED Reasoning Levels. *See, e.g.*, *Latham v. Colvin*, No. 1:13-CV-1637-WTL-TAB, 2014 WL 5106102, at *5 (S.D. Ind. Oct. 9, 2014) (approving hypothetical that stated "[d]ue to moderate limitations in concentration, persistence and pace, the hypothetical person can understand, remember, and perform simple work tasks with a GED

reasoning level two"). The Court thus concludes that the hypothetical questions at issue in this case properly communicated Plaintiff's limitations to the vocational expert. The resulting step five determination was therefore not erroneous, and remand is not required.

### Conclusion

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision that Patterson is not disabled. The Magistrate Judge therefore recommends that the Commissioner's decision be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 02/12/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov